896 F.Supp. 183 (1995)
Terry VAN DYKE, Plaintiff,
v.
Odie WASHINGTON, et al., Defendants.
No. 92-1301.
United States District Court, C.D. Illinois, Peoria Division.
August 3, 1995.
*184 *185 Marguerite Conboy, John Lapham, Kevin Evans, Schiff, Hardin & Waite, Chicago, IL, for plaintiff.
Assistant Attorney General Chad Fornoff, Springfield, IL, for defendants.

MEMORANDUM OPINION AND ORDER FOR JUDGMENT
KAUFFMAN, United States Magistrate Judge.
This is an action filed pursuant to 42 U.S.C. § 1983. The plaintiff seeks compensatory damages and equitable relief. The parties have consented to have this case heard to judgment by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the District Judge has referred the case to me. Now before the court are the parties' Cross-Motions for Summary Judgment (# 70-Pl.; # 74-Defs.) The motions are fully briefed and I have held a hearing. The plaintiff is represented by appointed counsel. After carefully considering all of the submissions of the parties, I conclude that the defendants' motion should be allowed.
Summary judgment is appropriate only if there is no genuine issue as to any material facts and the moving party is entitled to judgment as a matter of law, F.R.Civ.P. 56(c). In ruling on a summary judgment motion, the court may not weigh the evidence or resolve issues of fact. Disputed facts must be left for resolution in a trial. At this stage, the court's function is to determine whether there are genuine issues for trial. There are no genuine issues unless there is sufficient evidence favoring the non-moving party for a reasonable jury to return a verdict for that party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).
When faced with a summary judgment motion, the non-moving party must make a factual showing sufficient to establish the existence of a controverted material element essential to that party's case, and on which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In addition, all reasonable inferences from the factual evidence must be drawn in favor of the non-movant. DeValk Lincoln Mercury, Inc. v. Ford Motor Co., 811 F.2d 326 (7th Cir. 1987).

FACTS
Many of the relevant facts in this case are undisputed. The plaintiff is an inmate in the Illinois Department of Corrections (IDOC). In early 1992 he was housed at Hill Correctional Center in Galesburg. When the plaintiff entered the Department, he indicated that his religious preference was "Christian", without further designation of a particular denomination.
Sometime in early 1992 the plaintiff received information about the Church of Jesus Christ, Christian (CJCC). Some of this information came from other inmates, some from books and pamphlets. The CJCC was founded after World War II by Dr. Wesley Swift. It is the religious arm of the political Aryan Nation, a right-wing, militant, white supremacist movement which espouses racial purity and separatism, along with hatred of all non-Aryan races, especially Jews and Blacks. The CJCC is now headed by Richard Butler and is based in Hayden Lake, Idaho. The theological philosophy of the CJCC is "Dualist/Identity".
In March 1992 the plaintiff requested that his prison records be changed to reflect his religious preference as "Dualist/Identity". That request was denied by the defendant R. Lane Andrist, the Chaplain at Hill. The plaintiff also requested that the CJCC be recognized as a religious group at Hill, and that inmates be allowed to meet and conduct religious services with an outside preacher. That request was denied by Chaplain Andrist and confirmed by Assistant Warden Wanda Brown and by Warden Jerry Gilmore. The plaintiff filed grievances regarding these decisions, which were denied. Hill Correctional Center has not recognized CJCC as a religious *186 group and has not allowed group meetings.
During 1992 the plaintiff was sent publications from or about the CJCC and related organizations. These publications were rejected by Hill's publications review committee, which consisted of defendants Harriette McDonald, Diane Rockett and Marion Yeazle and were not given to the plaintiff. That decision was approved by Warden Gilmore. The disapproved publications were sent to the IDOC publications review committee, where they were reviewed by defendant James Simmons, who approved the Hill committee's decision to reject the material.
In August 1993, the plaintiff was transferred to Pontiac Correctional Center, where he is housed today. He alleges that officials at Pontiac have similarly refused to recognize the CJCC, but he has not named any Pontiac officials as defendants in this lawsuit.

LEGAL CLAIMS
The plaintiff makes two claims to this court. First, the plaintiff claims that his first amendment rights to free exercise of religion and his fourteenth amendment rights to equal protection of the laws have been violated by Hill's refusal to recognize the CJCC as a religious group; and second, that his first amendment rights to free speech and free exercise of his religion have been violated by the rejection of CJCC and related publications. The plaintiff argues that the free exercise claims must be analyzed under the Religious Freedom Restoration Act of 1993 (RFRA), 42 U.S.C. § 2000bb. The plaintiff sues Andrist, Brown, Gilmore, McDonald, Rockett, Yeazle and Simmons in their official and individual capacities. He sues Odie Washington, the current director of the IDOC in his official capacity only.
The defendants argue that they are entitled to qualified immunity on all of the plaintiff's claims; that under the applicable legal standards their actions regarding the plaintiff's claims were justified; and, that the RFRA is unconstitutional and should not apply to this case.

DISCUSSION

1. FREE EXERCISE OF RELIGION
The plaintiff claims that defendants Andrist, Brown and Gilmore have violated his free exercise rights by denying him access to group religious services in the prison and by refusing to allow him to re-designate his religious preference. He claims that defendants McDonald, Rockett, Yeazle, Simmons and Washington have violated his free exercise rights by denying him access to religious publications in the prison.

2. QUALIFIED IMMUNITY
A government official who, while acting under color of state law, deprives an individual of constitutionally protected rights may be subject to personal liability for civil damages under 42 U.S.C. § 1983. However, "the defense of qualified immunity shields government officials performing discretionary functions `from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Marshall v. Allen, 984 F.2d 787, 791 (7th. Cir.1993) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 819, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982)). Courts require officials to adhere to rules that have been made specific enough to set operational guidelines. The contours of the right must be sufficiently clear that a reasonable official would understand that what he or she is doing violates that right. Anderson v. Creighton, 483 U.S. 635, 640, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987).
It is not enough to state the general principle that officials may not infringe on the plaintiff's free exercise of his religion; the specific activity involved must be unlawful in the light of pre-existing law. Ibid. Principles of immunity stem from the belief that the law should develop in injunctive actions or damages actions against public bodies rather than at personal expense. Greenberg v. Kmetko, 922 F.2d 382, 384 (7th. Cir.1991).
The qualified immunity determination is a legal question for the court to decide, and is not to be answered in the abstract, but rather with reference to the particular facts *187 of the case, Rakovich v. Wade, 850 F.2d 1180, 1201-02 (7th. Cir.) (en banc); cert. denied 488 U.S. 968, 109 S.Ct. 497, 102 L.Ed.2d 534 (1988).
When a defendant raises the defense of qualified immunity, the court engages in a two-part, objective inquiry: the court must determine (1) whether the plaintiff has asserted a violation of a federal constitutional right, and (2) whether the constitutional standards implicated were clearly established at the time in question. Kernats v. O'Sullivan, 35 F.3d 1171, 1176 (7th. Cir.1994). The burden is on the plaintiff to prove that the asserted right was clearly established at the time of the alleged violation, Rakovich v. Wade, 850 F.2d at 1209.
It is well-established that prisoners "do not forfeit all constitutional protections by reason of their conviction and confinement to prison." O'Lone v. Estate of Shabazz, 482 U.S. 342, 347, 107 S.Ct. 2400, 2403, 96 L.Ed.2d 282 (1987) (quoting Bell v. Wolfish, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979)). Among the protections retained by prison inmates are those afforded by the first amendment, including the free exercise clause. Id. Therefore, the plaintiff has met part one of the Kernats test.
As to part two, the plaintiff argues that his right to free exercise of the CJCC religion were "clearly established" in 1992 based on two out-of-circuit cases, Wiggins v. Sargent, 753 F.2d 663 (8th. Cir.1985) and McCabe v. Arave, 827 F.2d 634 (9th. Cir. 1987). Neither of these cases stand for the proposition argued by the plaintiff.
In Wiggins the District Court had dismissed the plaintiff's free exercise claim, finding that the CJCC was not a religion. The Appellate Court reversed and remanded, finding that the District Court had applied the wrong standard for analyzing the plaintiff's religious claim. It remanded the case for further findings, which are not reported. In McCabe, the District Court had assumed that CJCC was a bona fide religion, without making any factual analysis. The Appellate Court accepted that finding without further analysis.
The parties have not cited any case from the Seventh Circuit or its district courts that establishes that the CJCC is a bona fide religion, and the court has found none. The facts before the court present a case of first impression in this circuit.
The Seventh Circuit Court of Appeals has stated that in almost any case of first impression, defendants are entitled to qualified immunity from money damages, Greenberg v. Kmetko, 922 F.2d 382, 385 (7th. Cir.1991) (Cudahy, concurring).
To establish a free exercise claim the plaintiff must make a factual showing that: (1) he espouses a bona fide religion; (2) his beliefs are sincerely held; and (3) the desired activity is essential to the practice of his religion. Wisconsin v. Yoder, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). Only after this initial burden is met does the court inquire into the state's intrusion and a standard of review.
After an extensive review of published legal opinions, the court has found no federal or state court that has recognized the CJCC as a bona fide religion after a factual analysis. This finding is essential to the plaintiff's free exercise case under the Kernats qualified immunity test.
I find that in 1992 it was not clearly established that the CJCC was a bona fide religion entitled to first amendment protection. Indeed, I find that the question remains unsettled in 1995. Accordingly, the defendants are entitled to qualified immunity from personal liability and from money damages on all aspects of the plaintiff's free exercise claim.

3. MOOTNESS
All of the defendants except James Simmons and Odie Washington are employees of Hill Correctional Center. The plaintiff's complaint is limited to activities at Hill during 1992 and 1993. In August 1993 the plaintiff was transferred to Pontiac Correctional Center, where he is housed today.
In light of the court's ruling on qualified immunity, does the plaintiff have a case or controversy on his free exercise claims with any of the defendants? Put another *188 way, would any injunctive relief this court might direct to any of the defendants benefit the plaintiff in any way? I find that the answer to both questions is "no", resulting in a finding that the equitable claims against the Hill defendants are moot.
The record shows that the decision to recognize any religious group is made by each institution based on all of the circumstances at that institution. There is no IDOC involvement in the decision. It is one for the chaplain and the wardens of each facility. Therefore, only the Hill defendants could be ordered to re-assess the plaintiff's claims regarding religious services. However, the plaintiff is no longer at Hill, he is at Pontiac. If the court ordered the defendants to reassess the plaintiff's requests or to recognize his religious beliefs, it would not benefit the plaintiff, since such a ruling could affect only the decisions at Hill.
Similarly, any order to re-evaluate the plaintiff's religious claims regarding receipt of publications would affect only the Hill publications defendants, and defendant Simmons is no longer in a position to review publications at IDOC.
The plaintiff argues that these claims are not moot because the plaintiff might be transferred back to Hill. There is nothing in the record to support that assertion. In order to meet the "capable of repetition yet evading review" test, the record must show a demonstrated probability that the same party will again be subject to the challenged action, Martin v. Davies, 917 F.2d 336, 339 (7th. Cir.1990) (quoting Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 349, 46 L.Ed.2d 350 (1975)); see also, Moore v. Thieret, 862 F.2d 148, 149-50 (7th. Cir.1988). There are twenty-three institutions for adult men in the IDOC. there is no "probability" that the plaintiff will be transferred to Hill, especially in light of his disciplinary problems there that prompted his transfer to Pontiac.
Accordingly, I find that there are no disputed material facts relating to the plaintiff's free exercise claim, and that all of the defendants are entitled to judgment as a matter of law.

4. EQUAL PROTECTION
The plaintiff claims that the treatment of his religious requests violated the equal protection clause because other similar inmate groups, such as the Nation of Islam and the Moorish Temple, are allowed to have group services and access to religious publications.
I find that this claim must fail because of the above analysis of qualified immunity and mootness.

5. GRIEVANCE
It is unclear from the complaint whether the plaintiff bases any of his claims on the denial of his grievances. The denial of his grievances is pleaded in the second amended complaint and the grievance procedure was discussed at length in several of the defendants' depositions.
If the plaintiff is attempting to state such a claim, it must fail. In Illinois there is no constitutional right to a grievance procedure, Azeez v. DeRobertis, 568 F.Supp. 8, 10 (N.D.Ill.1982). Any alleged failure to follow the procedure does not state a federal claim, as a violation of state law does not violate the constitution, Romano v. Oklahoma, ___ U.S. ___, ___, 114 S.Ct. 2004, 2011, 129 L.Ed.2d 1 (1994); Sandin v. Conner, ___ U.S. ___, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).
Accordingly, any claim against defendants McDonald and Gilmore regarding any of the plaintiff's grievances is dismissed for failure to state a federal claim.

6. PUBLICATIONS
The plaintiff claims that he was denied access to several CJCC publications. Piecing together the exhibits, it appears that the following publications were intercepted in the Hill mail room and were not forwarded to him:

March 17, 1992 1. Church of Jesus Christ, Christian
 (undated)
 2. Aryan Nations, Church of Jesus
 Christ, Christian (undated)
March 25, 1992 1. Church of Jesus Christ, Christian
 (undated)
 2. Aryan Nations, Church of Jesus
 Christ, Christian (undated)
June 24, 1992 1. Church of Jesus Christ, Christian
 pamphlet
 2. Racial Loyalty, #79
 3. Racial Loyalty, #78
September 10, 1992 1. Conspiracy or Degeneracy, Revelo
 Oliver, 1967
January 6, 1993 1. Church of Jesus Christ, Christian
 membership covenant

*189 Each of these publications was reviewed by the Hill publications committee, which consisted of defendants McDonald, Rockett and Yeazle. The committee decided to deny access to these publications, which decision was affirmed by defendant Gilmore. The publications were sent to the IDOC review committee. One of its members was defendant Simmons. The IDOC committee affirmed the denial of each of these publications.
The court's above ruling regarding qualified immunity and mootness of the free exercise claims applies to his free exercise claim as to publications as well.
Notwithstanding the finding of no viable free exercise claim, the plaintiff may still state a first amendment "speech" claim regarding the denial of the publications. In order to justify banning the publications on this ground the defendants need only establish that banning the publications bears a reasonable relationship to legitimate penological interests. In addition, the court must give great deference to decisions of prison officials. O'Lone v. Shabazz, 482 U.S. at 349, 107 S.Ct. at 2404-05.
Now comes the real problem. The record does not contain copies of the refused material, except the treatise entitled "Conspiracy or Degeneracy".[1] The parties have submitted material from the CJCC, but there is no way of knowing whether the material submitted has the same content or tenor as the material rejected by the Hill committee in 1992 and 1993.[2]
Assuming that the material is similar to the rejected material,[3] the court finds that the defendants have met their burden under the first amendment. Each of the rejected publications was rejected based on "a clear and present danger to the safety and security of the institution." I have reviewed all of the CJCC material submitted to the court, including "Conspiracy or Degeneracy" and issues of "Racial Loyalty", and I find that each publication contains overt negative racial commentary, constant use of pejorative racial terms, constant reinforcement of a "them against us" philosophy, and a "call to action" regarding protection of the Aryan race. (See, Aryan Nations, Church of Jesus Christ Christian Newsletter (#48); defendants' unnumbered exhibit; defendants' exhibit (#29)).
It is reasonable to conclude that promulgation of such material in a racially mixed prison setting could present a clear and present danger. This was the conclusion of the review committees, and the court gives great deference to that conclusion. It appears that each publication was reviewed by the committees, and each was rejected based on its contents.
The plaintiff argues that none of the defendants has identified any problems in the prison associated with the CJCC. However, the court cannot find that prison officials must wait until there is a racial confrontation directly attributable to the CJCC before they may control access to the kind of inflammatory publications at issue in this case.
Accordingly, the defendants McDonald, Rockett, Yeazle, Gilmore and Simmons are entitled to judgment as a matter of law on the plaintiff's first amendment free speech claim.

7. 1994 PUBLICATIONS GUIDELINES
This claim is apparently directed at defendant Washington, the current director of the IDOC.
The plaintiff concedes that the 1994 changes to the IDOC's publication review guidelines correct many of the alleged deficiencies in the earlier regulation, that is a *190 total ban on CJCC material. The 1994 regulation requires a case-by-case review of all CJCC publications. At oral argument, counsel for the plaintiff stated that he still was mounting a facial challenge to the validity of the regulation, in that it still allowed rejection of publications simply because they had a racial theme.
However, the plaintiff has provided no proof that any material sent to him has been rejected under the new policy. In fact, the record contains evidence that CJCC material is being received by the plaintiff under the new guidelines.
I find that the plaintiff fails to state a claim in that he has not alleged any injury to himself caused by the 1994 regulations. The defendant Washington is entitled to judgment as a matter of law on this claim.

8. RELIGIOUS FREEDOM RESTORATION ACT OF 1993
Finally, the court recognizes that the parties have spent considerable time and energy in ably briefing the issue of the constitutionality and application of the RFRA to the facts of this case. The RFRA would apply only to the plaintiff's free exercise claims, and would impose a heightened scrutiny to the state's actions. However, in view of the court's decision on qualified immunity and mootness of the free exercise claims, we never reach the merits of the plaintiff's allegations or the state's actions.
The plaintiff argues that the RFRA should "trump" qualified immunity because it is retroactive. I cannot agree. As discussed above, the Supreme Court has ruled that the court must look to the law at the time of the alleged violation to determine whether there is immunity. The RFRA was not the law until late 1993, long after the acts alleged in this complaint. To hold these defendants liable for violating a law that did not exist at the time of the alleged conduct would eviscerate the entire purpose of qualified immunity under Harlow and Anderson.
The defendants are immune from money damages flowing from the RFRA, and any equitable relief is moot, as discussed in this opinion.

SUMMARY
In summary, I find that there are no material facts in dispute. I further find that the defendants are entitled to the shield of qualified immunity from money damages on the plaintiff's free exercise claims, and that equitable relief on those claims is moot by the plaintiff's transfer to Pontiac. I find that the defendants were justified in rejecting the publications in issue, and that the plaintiff has failed to state a claim under the 1994 publications regulations.
The court notes the high quality of legal work done on this case by both sides. The court particularly recognizes the work of pro bono appointed counsel, Kevin Evans, John Lapham and Marguerite Conboy of Schiff, Hardin & Waite of Chicago, Illinois, for their excellent representation of the plaintiff in this case.
Accordingly, IT IS ORDERED that the plaintiff's motion for Summary Judgment (# 70) is DENIED; the defendants' Motion for Summary Judgment (# 74) is ALLOWED. The clerk is directed to enter judgment in favor of the defendants and against the plaintiff, each party to bear its own costs. CASE TERMINATED.
NOTES
[1] There is no requirement that the IDOC keep copies of rejected publications, indeed the space required to do so would be prohibitive, and the plaintiff doesn't know what he didn't get.
[2] Each defendant involved in the publications review was asked at his or her deposition to identify the material that was rejected, but none could do so. Each testified that the material presented at the deposition was similar to the material reviewed in 1992 and 1993.
[3] While it may seem improper to consider summary judgment with material evidence missing, there is no point in continuing this matter to trial. There is no indication that any of the missing material could be identified or produced.